## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

PORTIA MCCOLLUM, Derivatively on Behalf of Nominal Defendant RTX CORPORATION  f/k/a  RAYTHEON TECHNOLOGIES CORPORATION.,

        Plaintiff,

    v.

GREGORY J. HAYES, ROBERT K. ORTBERG, FREDERIC G. REYNOLDS, BRIAN C. ROGERS, TRACY ATKINSON, LEANNE G. CARET, BERNARD A. HARRIS, JR., GEORGE R. OLIVER, DINESH C. PALIWAL, ELLEN M. PAWLIKOWSKI, DENISE L. RAMOS, JAMES A. WINNEFELD, ROBERT O. WORK, THOMAS A. KENNEDY, MARGARET L. O'SULLIVAN, and MARSHALL O. LARSEN,

        Defendants,

   and

RTX CORPORATION,

        Nominal Defendant.

Case No. _____

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Portia McCollum ("Plaintiff"), by and through her undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant RTX Corporation (herein referred to as "RTX," "Raytheon," or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breaches of fiduciary duties and violations of federal law.  Plaintiff alleges the following based

upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Company's publicly available documents, including the allegations of the class action complaint filed in a securities class action, captioned *New England Teamsters Pension Fund v. RTX Corp. et al,* Case No. 3:23-cv-01274 (D. Conn. Sep. 28, 2023) (the "Securities Class Action"), conference call transcripts and announcements, filings with the United States Securities and Exchange Commission (the "SEC"), press releases published by and regarding RTX, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of RTX against certain officers and members of the Company's Board for unjust enrichment, waste of corporate assets, and breaches of their fiduciary duties between at least February 8, 2021, and September 8, 2023 inclusive (the "Relevant Period") and violation of the federal securities laws caused by the issuance of materially false and misleading statements that have exposed the Company to massive class-wide liability, as well as the expenditure of substantial defense costs in connection with the Securities Class Action, as set forth below.

2.      RTX is an aerospace and defense company incorporated in Delaware and based in Virginia that provides, *inter alia*, aircrafts, engines, satellites, drones, missiles, and cybersecurity solutions.

3.      Between at least 2015 and 2020, Connecticut headquartered Pratt & Whitney ("Pratt"), a subsidiary of RTX which designs and manufactures engines and spare parts for planes, experienced persistent quality control issues in the production of its Geared Turbofan ("GTF")

engines.

4.      Despite this, throughout the Relevant Period, the Individual Defendants issued statements that were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose the quality control issues or the fact that the issues would ultimately require the Company to recall and reinspect many of its engines.

5.      The truth began to emerge on July 25, 2023 when the Company first revealed the quality control issues, causing a 10.2% decline in the price of RTX's stock that day. The Individual Defendants, however, continued to mislead the public by obscuring the extent of the Company's liability.

6.      On September 11, 2023, the truth fully emerged when RTX issued a press release further detailing the quality control issues and several publications reported on the full extent of their financial impact on the Company. For instance, an article published by *The Wall Street Journal* reported that the Company's "profit will take up to a $3.5 billion hit from the recall of hundreds of engines over the next several years." On this news, the price of RTX's stock fell another 7.9%, closing at $76.90 on September 11, 2023.

7.      As a result of the foregoing, the Securities Class Action alleging violations of the federal securities law was filed against the Company, its CEO, its CFO and its former CFO, exposing the Company to massive class-wide liability.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 10(b) of the Exchange Act (15 U.S.C. §§ 78j(b)) and Rule 10b-5 (17

C.F.R.§240.10b-5) promulgated thereunder by the SEC.

9.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

10.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

11.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

12.     Venue is proper in this District pursuant to Section 27(a) of the Securities Exchange Act and 28 U.S.C. §1391(b)(1), because Pratt is headquartered in this Judicial District and a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this Judicial District.

## PARTIES

*Plaintiff*

13.     Plaintiff is, and has been at all relevant times, a shareholder of RTX.

*Nominal Defendant*

14.     Nominal Defendant RTX is incorporated under the laws of the State of Delaware.

15.     RTX's principal executive offices are located at 1000 Wilson Boulevard, Arlington, Virginia 22209. Pratt's corporate headquarters are located at 400 Main Street, East Hartford, Connecticut 06118. RTX's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "RTX."

*Individual Defendants*

16.     Defendant Gregory J. Hayes ("Hayes") has served as a member of the Board since

2014 and as CEO and Chairman of the Board since June 2021. Defendant Hayes further serves as a member of the Finance Committee. According to the Company's public filings, Defendant Hayes received $22,609,036 in 2022 in compensation from the Company.

17.     Defendant Robert K. Ortberg ("Ortberg") has served as a member of the Board since 2020 and serves as a member of the Finance Committee. According to the Company's public filings, Defendant Ortberg received $322,209 in 2022 in compensation from the Company.

18.     Defendant Frederic G. Reynolds ("Reynolds") has served as a member of the Board since 2016 and serves as Chair of the Audit Committee and as a member of the Governance and Public Policy Committee. According to the Company's public filings, Defendant Reynolds received $375,650 in 2022 in compensation from the Company.

19.     Defendant Brian C. Rogers ("Rogers") has served as a member of the Board since 2016 and serves as Chair of the Finance Committee and as a member of the Human Capital and Compensation Committee. According to the Company's public filings, Defendant Rogers received $337,209 in 2022 in compensation from the Company.

20.     Defendant Tracy Atkinson ("Atkinson") has served as a member of the Board since 2014 and serves as Chair of the Human Capital and Compensation Committee and as a member of the Finance Committee. According to the Company's public filings, Defendant Atkinson received $391,888 in 2022 in compensation from the Company.

21.     Defendant Leanne G. Caret ("Caret") has served as a member of the Board since January 16, 2023 and serves as a member of the Audit Committee.

22.     Defendant Bernard A. Harris, Jr. ("Harris") has served as a member of the Board since April 19, 2021 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant Harris received $341,888 in 2022 in compensation from the Company.

23.     Defendant George R. Oliver ("Oliver") has served as a member of the Board since 2013 and serves as a member of the Human Capital and Compensation Committee and the Finance Committee. According to the Company's public filings, Defendant Oliver received $311,888 in 2022 in compensation from the Company.

24.     Defendant Dinesh C. Paliwal ("Paliwal") has served as a member of the Board since 2016 and serves as a member of the Human Capital and Compensation Committee and the Governance and Public Policy Committee. According to the Company's public filings, Defendant Paliwal received $415,650 in 2022 in compensation from the Company.

25.     Defendant Ellen M. Pawlikowski ("Pawlikowski") has served as a member of the Board since 2018 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant Pawlikowski received $351,559 in 2022 in compensation from the Company.

26.     Defendant Denise L. Ramos (Ramos") has served as a member of the Board since 2018 and serves as a member of the Audit Committee and the Finance Committee. According to the Company's public filings, Defendant Ramos received $351,888 in 2022 in compensation from the Company.

27.     Defendant James A. Winnefeld, Jr. ("Winnefeld") has served as a member of the Board since 2017 and serves as a member of the Human Capital and Compensation Committee and the Governance and Public Policy Committee. According to the Company's public filings, Defendant Winnefeld received $361,888 in 2022 in compensation from the Company.

28.     Defendant Robert O. Work ("Work") has served as a member of the Board since 2017 and serves as Chair of the Governance and Public Policy Committee and as a member of the Audit Committee. According to the Company's public filings, Defendant Work received $365,329

in 2022 in compensation from the Company.

29.     Defendant Thomas A. Kennedy ("Kennedy") served as CEO and Chairman of the Board between 2014 and June 2021. According to the Company's public filings, Defendant Kennedy received $24,523,752 in 2021 in compensation from the Company.

30.     Defendant Margaret L. O'Sullivan ("O'Sullivan") served as a member of the Board between 2017 and May 2, 2023. According to the Company's public filings, Defendant O'Sullivan received $311,559 in 2022 in compensation from the Company.

31.     Defendant Marshall O. Larsen ("Larsen") served as a member of the Board between 2012 and April 25, 2022. According to the Company's public filings, Defendant Larsen received $331,387 in 2021 in compensation from the Company.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

32.     By reason of their positions as officers and/or directors of RTX, and because of their ability to control the business and corporate affairs of RTX, the Individual Defendants owed RTX and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage RTX in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of RTX and its shareholders.

33.     Each director and officer of the Company owes to RTX and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

34.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of RTX, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

7

35.     To discharge their duties, the officers and directors of RTX were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

36.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of RTX, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

37.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

38.     To discharge their duties, the officers and directors of RTX were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal

controls of the Company. By virtue of such duties, the officers and directors of RTX were required to, among other things:

        (a)      Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to RTX's own Code of Conduct;

        (b)      Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

        (c)      Remain informed as to how RTX conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

        (d)      Establish and maintain systematic and accurate records and reports of the business and internal affairs of RTX and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

        (e)      Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that RTX's operations would comply with all applicable laws and RTX's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

        (f)      Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate; and

(g)      Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

39.      The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by RTX.

40.      At all times relevant hereto, the Individual Defendants were the agents of each other and of RTX and were at all times acting within the course and scope of such agency.

41.      Each of the Individual Defendants breached his or her fiduciary duties as alleged herein, both individually and in concert with the other Defendants.

## RTX'S CODE OF BUSINESS ETHICS

42.      RTX's Code of Conduct begins with a message from Defendant Hayes stating, in relevant part:

> [O]ur business reputation depends upon doing the right thing—not just some of the time, but all of the time. Conducting ourselves with thoughtful integrity fosters trust with our colleagues, customers, and business partners; it also helps us sustain a positive work environment and a strong ethical culture.

> The values of Trust, Respect, Accountability, Collaboration, and Innovation inform our actions and serve as the foundation for out Code of Conduct.

43.      The Code of Conduct expressly applies to "all employees, officers, and directors of Raytheon Technologies," and in the event of a violation of the Code of Conduct, "disciplinary action is likely to occur—up to and including employment termination."

44.      In a subsection titled "Delivering Safe, High-Quality Products and Services," the Code of Conduct states, in relevant part:

Delivering safe, high-quality products and services means that we:

- Prioritize safety and excellence in everything we design, manufacture, deliver, install, maintain, and repair;
- Design our products and services to meet or exceed government regulations and industry standards;

\* \* \*

- Complete all required inspections and testing accurately and on time, ensuring all documentation is current, accurate, and complete.

45.     In a subsection titled "Dealing Honestly and Fairly," the Code of Conduct states:

"We are fair, truthful, and transparent in all our business dealings."

46.     In a subsection titled "Creating, Maintaining, and Disclosing Accurate Books and Records," the Code of Conduct states, in relevant part:

Creating, maintaining, and disclosing accurate books and records means that we:

- Record all assets, liabilities, revenues, expenses, and business transactions completely, accurately, in the proper period, and in a timely manner;
- Prepare books and records to conform to generally accepted accounting principles, our policies, and our internal controls system;

\* \* \*

- Correct any errors promptly, notifying those affected.

47.     In a subsection titled "Safeguarding Company Assets," the Code of Conduct includes a commitment to: "Design and follow internal controls that help ensure accurate financial reporting and full compliance with laws and regulations."

## RTX'S AUDIT COMMITTEE CHARTER

48.     Pursuant to RTX's Audit Committee Charter, the primary function of the Audit Committee is to:

[A]ssist the Board in its oversight responsibilities relating to: the integrity of the Company's financial statements; the independence, qualifications and performance of the Company's internal and external auditors; the Company's compliance with its policies and procedures, internal controls, Code of Conduct and applicable laws and regulations; policies and procedures with respect to risk assessment and management; and such other responsibilities as delegated by the Board from time to time.

11

49.     With respect to public disclosure matters, the Audit Committee Charter states that the Audit Committee shall: "Discuss with management and the independent auditor significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements."

50.     The Audit Committee Charter continues, stating that the Audit Committee shall:

Discuss the adequacy and effectiveness of the Company's internal controls with management, the independent auditor and the internal auditor in conjunction with the Company's CEO and CFO certification process for the Reports on For 10-K and Form 10-Q, including any significant deficiencies or material weaknesses in the design or operation of internal controls over financial reporting and additional management procedures and audit steps performed in light of any material control deficiencies.

51.     In a section titled "Oversight of the Company's Internal Audit Function," the Audit Committee Charter stated that the Audit Committee shall: "Review significant findings and key trends related to the Company's internal controls, risk management and governance processes."

52.     In a section titled "Compliance Oversight Responsibilities," the Audit Committee Charter states that the Audit Committee shall: "Oversee and review the Company's legal, ethical and regulatory compliance program, including the Company's business conduct guidelines, and review at least annually the implementation and effectiveness of the program."

## SUBSTANTIVE ALLEGATIONS

*Background*

53.     RTX is an aerospace and defense company incorporated in Delaware and based in Virginia that provides, *inter alia*, aircrafts, engines, satellites, drones, missiles, and cybersecurity solutions.

54.     RTX acquired Pratt in April 2020, as part of an industry merger with United Technologies Corporation. Among other things, Pratt designs and manufactures engines and spare

parts for planes. Pratt's popular GTF engine purportedly offers fuel efficiency and sustainability benefits.

55.    Between at least 2015 and 2020, significant quality control issues impacted the production of GTF engines due to a flaw in the powder metal used to make some of the engine parts.

56.    Despite this, the Individual Defendants concealed the issue for years. When the quality control issues were finally revealed in 2023, the Individual Defendants continued to mislead the public by downplaying the extent of the Company's liability.

***Materially False and Misleading Statements***

57.    On February 8, 2021, RTX filed its 2020 Annual Report on Form 10-K with the SEC (the "2020 10-K"), which included certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendant Hayes attesting to the accuracy of the report. The 2020 10-K was further signed by Defendants Hayes, Atkinson, Larsen, Oliver, Ortberg, O'Sullivan, Paliwal, Pawlikowski, Ramos, Reynolds, Rogers, Winnefeld, and Work.

58.    With respect to Pratt and its GTF engines, the 2020 10-K stated:

Pratt & Whitney sells products and services principally to aircraft manufacturers, airlines and other aircraft operators, aircraft leasing companies and the U.S. and foreign governments. Pratt & Whitney's largest customer by sales is Airbus, with sales, prior to discounts and incentives, of 30%, 31% and 36% of total Pratt & Whitney segment sales in 2020, 2019 and 2018, respectively.

Pratt & Whitney produces the PW1000G Geared Turbofan engine family, the first of which, the PW1100G-JM, entered into service in January 2016. ***The PW1000G Geared Turbofan engine has demonstrated a significant reduction in fuel burn and noise levels and lower environmental emissions when compared to legacy engines. The PW1100G-JM engine is offered on the Airbus A320neo family of aircraft.*** PW1000G Geared Turbofan engine models also power the Airbus A220 passenger aircraft and Embraer's E-Jet E2 family of aircraft and have been selected to power the new Irkut MC-21 passenger aircraft. Mitsubishi and Pratt & Whitney have signed a contract in recognition of the formal pause in MRJ70 and MRJ90 engine development for the SpaceJet program. In addition, P&WC's PW800 engine

has been selected to exclusively power Gulfstream's new G500 and G600 business jets, as well as to power Dassault's new Falcon 6X business jet, which is scheduled to enter into service in 2022.

* * *

In 2020, ***Pratt & Whitney reached significant milestones on the Geared Turbofan (GTF) engine program, including achieving an industry-leading engine dispatch reliability rate of 99.98% for the GTF engines for the Airbus A320neo.*** The GTF engine family now powers more than 900 aircraft across 50 airlines and three aircraft platforms: Airbus A320neo family, Airbus A220 and Embraer E-Jets E2 family. Pratt & Whitney also delivered the 50,000th PT6 turboprop engine in the General Aviation segment.[1]

59.    The 2020-K contained the following misleading risk disclosure regarding the GTF

engines:

> ***We Design, Manufacture and Service Products that Incorporate Advanced Technologies; The Introduction of New Products and Technologies Involves Risks and We May Not Realize the Degree or Timing of Benefits Initially Anticipated; Competition May Reduce Our Revenues and Segment Share and Limit Our Future Opportunities.***
>
> We seek to achieve growth through the design, development, production, sale and support of innovative commercial aerospace and defense systems and products that incorporate advanced technologies. The product, program and service needs of our customers change and evolve regularly, and we invest substantial amounts in research and development efforts to pursue advancements in a wide range of technologies, products and services.
>
> ***Of particular note, Pratt & Whitney is currently producing and delivering the PW1000G Geared Turbofan engine to power various aircraft, including the A320neo family of aircraft.*** The level of orders received for the Geared Turbofan family of engines, coupled with a requirement to achieve mature production levels in a very short time frame, require significant additional manufacturing and supply chain capacity. If any of our production ramp-up efforts are delayed, if suppliers cannot timely deliver or perform to our standards, and/or if we identify or experience issues with in-service engines, we may not meet customers' delivery schedules, which could result in material additional costs, including liquidated damages or other liabilities that could be assessed under existing contracts.

---

[1] Unless indicated otherwise, all emphasis in this Complaint is added.

Our ability to realize the anticipated benefits of our technological advancements depends on a variety of factors, including meeting development, production, certification and regulatory approval schedules; receiving regulatory approvals; execution of internal and external performance plans; availability of supplier and internally produced parts and materials; performance of suppliers and subcontractors; availability of supplier and internal facility capacity to perform maintenance, repair and overhaul services on our products; hiring and training of qualified personnel; achieving cost and production efficiencies; identification of emerging technological trends for our target end-customers; validation of innovative technologies; risks associated with the development of complex software; the level of customer interest in new technologies and products; and customer acceptance of products we manufacture or that incorporate technologies we develop. For example, our customers manufacture end products and larger aerospace systems that incorporate certain of our aerospace products. These systems and end products may also incorporate additional technologies manufactured by third parties and involve additional risks and uncertainties. As a result, the performance and industry acceptance of these larger systems and end products could affect the level of customer interest in and acceptance of our products in the marketplace.

60.     On February 11, 2022, GTC filed its 2021 Annual Report on Form 10-K with the SEC (the "2021 10-K"), which included SOX certifications signed by Defendant Hayes attesting to the accuracy of the report. The 2021 10-K was further signed by Defendants Hayes, Atkinson, Harris, Larsen, Oliver, Ortberg, O'Sullivan, Paliwal, Pawlikowski, Ramos, Reynolds, Rogers, Winnefeld, and Work. With respect to Pratt, the 2021 10-K stated:

> Pratt & Whitney sells products and services principally to aircraft manufacturers, airlines and other aircraft operators, aircraft leasing companies and the U.S. and foreign governments. Pratt & Whitney's largest commercial customer by sales is Airbus, with sales, prior to discounts and incentives, of 31%, 30% and 31% of total Pratt & Whitney segment sales in 2021, 2020 and 2019, respectively.
>
> ***Pratt & Whitney produces the PW1000G Geared Turbofan (GTF) engine family, the first of which, the PW1100G-JM, entered into service in January 2016. The PW1000G GTF engine has demonstrated a significant reduction in fuel burn and noise levels and lower environmental emissions when compared to legacy engines.*** The PW1100G-JM engine is offered on the Airbus A320neo family of aircraft. PW1000G GTF engine models also power the Airbus A220 passenger aircraft and Embraer's E-Jet E2 family of aircraft and have been certified by the Russian civil aviation authority to power the Irkut MC-21 passenger aircraft. In addition, P&WC's PW800 engine has been selected to exclusively power

15

Gulfstream's G400, G500 and G600 business jets, as well as to power Dassault's Falcon 6X business jet, which is scheduled to enter into service in 2022.

* * *

***The development of new engines and improvements to current production engines present important growth opportunities for Pratt & Whitney. In view of the risks and costs associated with developing new engines, Pratt & Whitney has entered into collaboration arrangements in which revenues, costs and risks are shared with third parties.*** At December 31, 2021, the interests of third-party collaboration participants in Pratt & Whitney-directed jet engine programs ranged, in the aggregate per program, from 13% to 49%. See "Note 1: Basis of Presentation and Summary of Accounting Principles" within Item 8 of this Form 10-K for a description of our accounting for collaboration arrangements. Pratt & Whitney also continues to enhance its programs through performance improvement measures and product base expansion, utilizing similar collaboration arrangements.

***In 2021, Pratt & Whitney reached significant milestones on the GTF engine program, including the first flight of the GTF Advantage engine for the A320neo family. The GTF Advantage configuration further extends the economic and environmental benefits of the existing GTF engine, as it reduces fuel consumption by an additional 1 percent, extending the engine's lead as the most efficient powerplant for the A320neo family***. The GTF family now powers more than 1,100 aircraft across 58 airlines and three aircraft platforms: Airbus A320neo family, Airbus A220 and Embraer E-Jets E2. Also in 2021, Pratt & Whitney's V2500 program achieved 250 million flight hours. Pratt & Whitney was announced as the engine provider on the Dassault Falcon 6X and Gulfstream G400, representing two new platforms for its PW800 engine.

61.    The 2021 10-K contained the following generic risk disclosure regarding GTF

production:

We ***Design, Manufacture and Service Products that Incorporate Advanced Technologies; The Introduction of New Products and Technologies Involves Risks and We May Not Realize the Degree or Timing of Benefits Initially Anticipated; Competition May Reduce Our Revenues and Segment Share and Limit Our Future Opportunities.*** We seek to achieve growth through the design, development, production, sale and support of innovative commercial aerospace and defense systems and products that incorporate advanced technologies. The product, program and service needs of our customers change and evolve regularly, and we invest substantial amounts in research and development efforts to pursue advancements in a wide range of technologies, products and services. Of particular note, Pratt & Whitney is currently producing and delivering the Geared Turbofan engine to power various aircraft. The level of orders received for the Geared Turbofan family of engines, coupled with a requirement to achieve mature production levels in a very short time frame, require significant additional manufacturing and supply chain capacity. If any of our production ramp-up

16

efforts are delayed, if suppliers cannot timely deliver or perform to our standards, and/or if we identify or experience issues with in-service engines, we may not meet customers' delivery schedules, which could result in material additional costs, including liquidated damages or other liabilities that could be assessed under existing contracts.

62.     On February 7, 2023, RTX filed its 2022 Annual Report on Form 10-K with the SEC (the "2022 10-K"), which included SOX certifications signed by Defendant Hayes attesting to the accuracy of the report. The 2022 10-K was further signed by Defendants Hayes, Atkinson, Caret, Harris, Oliver, Ortberg, O'Sullivan, Paliwal, Pawlikowski, Ramos, Reynolds, Winnefeld, and Work. With respect to Prat and its GTF engine production, the 2022 10-K stated:

Pratt & Whitney sells products and services principally to aircraft manufacturers, airlines and other aircraft operators, aircraft leasing companies and the U.S. and foreign governments. Pratt & Whitney's largest commercial customer by sales is Airbus, with sales, prior to discounts and incentives, of 33%, 31% and 30% of total Pratt & Whitney segment sales in 2022, 2021 and 2020, respectively.

Pratt & Whitney produces the PW1000G Geared Turbofan (GTF) engine family, the first of which, the PW1100G-JM, entered into service in January 2016. The PW1000G GTF engine has demonstrated a significant reduction in fuel burn and noise levels and lower environmental emissions when compared to legacy engines. The PW1100G-JM engine is offered on the Airbus A320neo family of aircraft. PW1000G GTF engine models also power the Airbus A220 passenger aircraft and Embraer's E-Jet E2 family of aircraft. In addition, P&WC's PW800 engine has been selected to exclusively power Gulfstream's G400, G500 and G600 business jets, as well as to power Dassault's Falcon 6X business jet, which is scheduled to enter into service in 2023.

* * *

The development of new engines and improvements to current production engines present important growth opportunities for Pratt & Whitney. In view of the risks and costs associated with developing new engines, Pratt & Whitney has entered into collaboration arrangements in which revenues, costs and risks are shared with third parties. At December 31, 2022, the interests of third-party collaboration participants in Pratt & Whitney-directed jet engine programs ranged, in the aggregate per program, from 13% to 49%. See "Note 1: Basis of Presentation and Summary of Accounting Principles" within Item 8 of this Form 10-K for a description of our accounting for collaboration arrangements. Pratt & Whitney also continues to enhance its programs through performance improvement measures and product base expansion, utilizing similar collaboration arrangements.

*In 2022, Pratt & Whitney reached significant milestones on the GTF engine program, including surpassing a billion gallons of fuel saved and 10 million metric tons of carbon emissions avoided since entry into service. The GTF Advantage engine for the A320neo family began Federal Aviation Regulations Part 33 (FAR33) certification and development flight testing on the A320neo aircraft, and successfully ran on 100% sustainable aviation fuel (SAF). The GTF Advantage configuration extends the economic and environmental benefits of today's GTF engine, as it reduces fuel consumption by an additional 1 percent, extending the engine's lead as the most efficient powerplant for the A320neo family. The GTF family now powers more than 1,400 aircraft across 64 airlines and three aircraft platforms: Airbus A320neo family, Airbus A220 and Embraer E-Jets E2.* The year also saw the entry into service of multiple new platforms, including the Cessna SkyCourier, Daher Kodiak 900 and TBM960, and ATR's next generation 42 & 72 aircraft powered by the new PW127XT-M engines, with Transport Canada engine certifications of the PW127XT-M, PW812GA and PW812D engines to power the ATR 72-600 regional turboprop, Gulfstream G400 and Dassault Falcon 6X aircraft respectively.

63.    The statements identified in ¶¶ 57-62 were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) Pratt's GTF engines had been experiencing significant quality control issues between at least 2015 and 2020; (ii) these quality control issues would ultimately require the Company to recall and reinspect many of its GTF airplanes; and (iii) as a result, the Individual Defendants' statements about its business, operations, and prospects lacked a reasonable basis at all relevant times.

**The Truth Emerges**

64.    On July 25, 2023, *Reuters* published an article titled "RTX shares tumble on Pratt & Whitney airliner engine problem." The article revealed issues with Pratt engines, stating that the price of RTX's stock had fallen "10% . . . as it said more than 1,000 engines must [be] removed from Airbus planes and checked for microscopic cracks." This was purportedly a result of a "'rare condition' in powdered metal [which[ meant 1,200 of more than 3,000 engines . . . have to be taken off and inspected for micro cracks that would point to fatigue." The article further reported that

"[q]uestions remained over the cash impact" to the Company.

65.    On this news, RTX's share price fell 10.2%, to close at $87.10 on July 25, 2023.

66.    Despite this, the Individual Defendants continued to issue false and misleading statements, obscuring the extent of the Company's issues. For instance, during an earnings call that same day (the "Q2 2023 Earnings Call"), the Company stated that, as a result of the quality control issues, RTX would have to inspect 1,200 potentially impacted engines and reduce the Company's cash flow for 2023 by $500 million.

67.    On September 11, 2023, the Company issued a press release revealing that the scope of RTX's liability was much larger than what had been previously represented. A series of news articles released on the same day reported the previously undisclosed financial impact of the quality control issues on the Company. For instance, *The Wall Street Journal* published an article title "RTC Engine Recall to Cut Profit by Up to $3.5 Billion which reported that it would "cost [RTX] up to $7 billion to repair Pratt & Whitney engines and compensate airlines for fixes that will ground more than 600 Airbus jet for inspections in 2024," and that RTX's "profit will take up to a $3.5 billion hit from the recall of hundreds of engines over the next several years." Similarly, on the same day, the *Financial Times* published an article titled "RTX hit with $3bn charge from Pratt & Whitney aero engine recall," which noted that the costs associated with the GTF engine quality control issues were "a greater hit than [RTX] initially signaled in July." *Bloomberg* also published an article titled "Pratt Engine Flow to Idle Hundreds of A320 Planes for Years," which revealed that 3,000 GTF engines would be inspected by the Company, as opposed to the previously reported 1,200.

68.    On this news, the price of RTX's stock fell 7.9%, closing at $76.90 per share on September 11, 2023.

19

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

69. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

70. RTX is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

71. Plaintiff is a current shareholder of RTX and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

72. At the time this action was commenced, the thirteen-member Board was comprised of Defendants Hayes, Atkinson, Caret, Harris, Oliver, Ortberg, Paliwal, Pawlikowski, Ramos, Reynolds, Rogers, Winnefeld, and Work (the "Director Defendants"). Accordingly, Plaintiff is only required to show that seven Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Board's current directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

73. The Director Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Director Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Director Defendants authorized and/or permitted the false statements

to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein. Accordingly, the Director Defendants could not fairly and fully prosecute such a suit even if they instituted it.

74.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

75.    The Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

76.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

77.    Defendants Reynolds, Caret, Harris, Pawlikowski, Ramos, and Work serve on the Company's Audit Committee (the "Audit Defendants") and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial accounting and reporting, the underlying internal controls and procedures over financial reporting, and the audits of the financial statements. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business and the adequacy of its internal controls as alleged

above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

78.     The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Directors to also adhere to the Company's standards of business conduct. The Directors violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

79.     The Director Defendants derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded the directors from adequately monitoring the Company's operations and internal controls and calling into question the other Individual Defendants' conduct. Specifically, none of the Director Defendants have taken remedial action to redress the conduct alleged herein. For instance, none of the Director Defendants have sought to enforce the Company's Clawback Policy, which permits "the Company to recoup Incentive Compensation upon the occurrence of certain Forfeiture Events," including "[n]egligent conduct injurious to the Company, including negligent supervision of a subordinate whose action requires a restatement of financial results, or other significant harm to the Company as determined by the [Human Capital & Compensation] Committee."

80.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and

intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

81.     The acts complained of herein constitute violations of fiduciary duties owed by RTX's officers and directors, and these acts are incapable of ratification.

82.     The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds *i.e.*, monies belonging to the stockholders of RTX. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Individual Defendants were to sue themselves or certain officers of RTX, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

83.     If there is no directors' and officers' liability insurance, then the directors will not cause RTX to sue the Defendants named herein, since, if they did, they would face a large

uninsured individual liability. Accordingly, demand is futile in that event as well.

84.     Thus, for all of the reasons set forth above, all of the directors are unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## COUNT I
### Against the Individual Defendants for Violations of § 10(b)
### of the Exchange Act, 15 U.S.C. § 78(j), and Rule 10b-5, 17 C.F.R. § 240.10b-5

85.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

86.     The Individual Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

87.     The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the materially false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

88.     The Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated.

89.     The Individual Defendants acted with scienter because they: (i) knew that the public documents and statements issued or disseminated in the name of RTX were materially false and

misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

90.     The Individual Defendants, by virtue of their receipt of information reflecting the true facts of RTX, their control over, and/or receipt and/or modification of RTX's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning RTX, participated in the fraudulent scheme alleged herein.

91.     As a result of the foregoing, the market price of RTX common stock was artificially inflated during the relevant time period. In ignorance of the falsity of the statements, Plaintiff relied on the statements described above and/or the integrity of the market price of RTX common stock in purchasing RTX common stock at prices that were artificially inflated as a result of these false and misleading statements and were damaged thereby.

92.     In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Action and reputational harm. The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Action.

**COUNT II**
**Against the Individual Defendants**
**For Breach of Fiduciary Duty**

93.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

94.     The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

95.     The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

96.     The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, issuing, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

97.     As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

98.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself

in the Securities Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

99.     Plaintiff, on behalf of RTX, has no adequate remedy at law.

**COUNT III**
**Against the Individual Defendants**
**For Unjust Enrichment**

100.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

101.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, RTX.

102.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from RTX that was tied to the performance or artificially inflated valuation of RTX or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

103.    Plaintiff, as a stockholder and a representative of RTX, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

104.    Plaintiff on behalf of RTX has no adequate remedy at law.

**COUNT IV**
**Against the Individual Defendants**
**For Waste of Corporate Assets**

105.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

27

106.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

107.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and collecting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Action.

108.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

109.    Plaintiff, on behalf RTX, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Awarding punitive damages;

D.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.


## JURY DEMAND

Plaintiff hereby demands a trial by jury.

October 27, 2023                          **LACHTMAN COHEN P.C.**

                                          By:  */s/ Brian S. Cohen*                
                                                  Brian S. Cohen
                                                  500 West Putnam Avenue, Suite 400
                                                  Greenwich, CT 06830
                                                  Telephone: (203) 404-4960
                                                  Email: bcohen@lcplaw.com

                                                  **RIGRODSKY LAW, P.A.**
                                                  Seth D. Rigrodsky
                                                  Timothy J. MacFall
                                                  Gina M. Serra
                                                  Samir Aougab
                                                  825 East Gate Boulevard, Suite 300
                                                  Garden City, NY 11530
                                                  Telephone: (516) 683-3516
                                                  Facsimile: (302) 654-7530
                                                  Email: sdr@rl-legal.com
                                                          tjm@rl-legal.com
                                                          gms@rl-legal.com
                                                          sa@rl-legal.com

                                                  **GRABAR LAW OFFICE**
                                                  Joshua H. Grabar
                                                  One Liberty Place
                                                  1650 Market Street, Suite 3600
                                                  Philadelphia, PA 19103
                                                  Telephone:  (267) 507-6085
                                                  Email: jgrabar@grabarlaw.com

                                                  *Attorneys for Plaintiff Portia McCollum*

## <u>VERIFICATION OF PORTIA MCCOLLUM</u>

I, Portia McCollum, am a plaintiff in this action.  I have reviewed the allegations made in the Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. As to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 10/20/2023

Portia McCollum